Thank you, your honor. Just making sure you can hear me. All right. Good morning. May it please the court. My name is Jessica and I represent the petitioner in this matter, Fernando Lemus-Hernandez. I'd like to reserve three minutes for rebuttal, which I believe is already on the clock. This court should reject the immigration judge's decision regarding the petitioner's applications for withholding of removal and protection under the Convention Against Torture for the following reasons. The immigration judge erred in finding that the proposed particular social group was not cognizable under the Act for Lacking Particularity and Social Distinction, that his proposed particular social group lacked the required nexus, erred in finding that there was no government acquiescence on behalf of the Guatemalan government. Let me interrupt you. I know you're talking and I guess my job is to interrupt you. So I'm intrigued by this whole concept of what constitutes a large land-owning families. Under Cordova and other cases, we recognize that under particular circumstances could qualify as a possible social group. But I'm just puzzled as to how you arrive at the conclusion that in this particular case or in any other case, large land ownership by families would qualify for PSG consideration. What have you done in this case to satisfy me that that is so under these particular circumstances? Yes, Judge, I think that there's two things that we have to look to to make sure that this reaches the particular, well, particularity and the social distinction. So I want to take those each in turn of why I think that this case is distinguished from others. The first is that I do think that there is particularity in this case. There's a clear family members of those landowners. We would note that the judge does seem to concede that the nuclear family members is particular. But then when we narrowed that term to the of landowners of Guatemala, the judge found in this case that maybe it became too broad. We would know that that would not be the case in this case. For starters, the petitioner in this case, although the record doesn't contain like current statistics regarding landowners in Guatemala, he did submit evidence noting that 2.5% of farms occupy more than 65% of the land in Guatemala. And that's in the administrative record at 512. And also provided evidence that Guatemala, unlike other countries, has what's called the world's largest inequality of land distribution in Guatemala. How does that tell us anything about particularity or social distinction though? Well, I think that that does narrow it. It doesn't necessarily mean that everyone would qualify as, I mean, it gives a clear benchmark. Either the family owns land in Guatemala, they hold title to that land or they don't. So I do think that that makes it more particular. Okay, well, let's assume particularity for a moment. I could ask you about that more, but what is the social distinction evidence? Judge, I do also think that there's a social distinction in this case. I do think that the immigration judge ignored some evidence in this case that shows that there is social distinction in Guatemala. The petitioner in this case did provide evidence showing that in Guatemala specifically, that there has been land disputes. That there are government agencies to try to better, how do I say, facilitate these land disputes. And we also provided- What I saw in the record was articles about land reform or with the kind of statistics you were talking about, about the amount of inequality in terms of land ownership. But that doesn't really speak to whether when you're walking down the street, people in the and recognize you as such, or any kind of the social distinction type things that we would need to look for. Sure, I do think that the petitioner testified in this case. And I would, I mean, I would acknowledge in this case that the record is, I mean, maybe lacking some of the necessary information as the immigration judge had stated. For example, maybe the number of people that own land in Guatemala, you know, how much land on average do they own? Likely because the But he did testify during the hearing that he would be socially distinct because maybe unlike landowners in the United States, that landowners are often absentee. Families in Guatemala often live in these locations for generations. And I think that's the case in the petitioner's case. He's testified that his uncle, his father, and his grandfather all lived on the land. They cultivated the land. And I think that that's what makes them socially distinct within their country is that they for years and years that they would be on that land and be known by their family name. Don't they have to be perceived by Guatemalan society as a distinct group rather than just their particular circumstances? Yes, yes, it would have to be perceived also by the Guatemalan society. And that's what I I'm puzzled because I don't know in this society vis-a-vis in this particular case, large land ownership may be an impossible standard to ever comply with. I just wonder whether it is possible. Oh, I do think that it's a standard that can be complied with. I mean, by showing that. Well, I mean, if we're seeing social distinction, how are we socially visible to society? You know, as I already stated, I do believe that that is goes back to, you know, that the petitioner testified that these are landowning families in Guatemala. And as far as Guatemala as itself, does it recognize these landowners? I do think that there is some evidence in the record, although it could be developed further to show that there are organizations that are set up specifically to help landowners with some of these land disputes that are going on, which shows that landowners do have some sort of rights and that they have certain protections that are provided by the Guatemalan government to give them that particularity. It just seems to me that this particular PSG situation dealing with large land ownership is a slippery slope. And I'm going to ask your adversary, have you ever established the perception that's necessary that this is a distinct group? I don't know. I mean, it's me, it's words and it's a conclusion. But in terms of putting the meat to the bones, I'm not so sure whether it's ever possible. I just wonder what thoughts you have. I'm going to ask your adversary the same question. Well, Judge, I don't see how it's not. I mean, these are, I mean, we have distinguishing characteristics and we have the innate characteristic that he belongs to this family, this nuclear family. I mean, he's born into it. And then they have title to that land. In this case, I believe it's a substantial amount of land. It would be this 55 hectares, which comes out to about 137 acres of land. But I think that even if we were to somehow narrow that, and I know that the government mentioned that this would encompass a large group of landowning families. I don't think size alone would disqualify it as a particular social group. Land can be targeted based on the location of the land or also perhaps minerals. That's some of the, one of the articles that was provided, that these lands are targeted by criminal organizations. Let me interrupt again. It has a major hurdle to overcome because even if we were to assume this to be a PSG, you have a finding of fact here by the IJ that there was not the necessary nexus between the ownership and what happened here. And he made a finding that it was really something that was done for the profit of a criminal organization and to retaliate against the family. It was purely a fact finder. And I think you have a real hurdle to overcome in terms of showing that that was clear error, I guess. Judge, we do think that that was a clear error in this case, that as you just stated, immigration judge did find that there was a profit as only as a motive and that did not qualify. We would state that the record does not support the judge's finding that the family was targeted solely for profit. The petitioner testified that his family no longer runs the land and yet the persecutors continue to target his family. His family moved off the land shortly after 1996 or 1997 when his grandfather was killed. And yet his grandmother was run over in 2003 and his aunt was also targeted, I believe in 2017. And also it doesn't seem to be purely personal retribution where the petitioner testified that landowners in the region have received similar threats that his family had received. And I believe that the petitioner at the IJ level did submit again, one article noting that criminal organizations were coming through and targeting landowners. We'd also just ask this court to take into consideration the recent decision by this court of Naranjo Garcia v. Wilkinson, which states that when there's a sweeping retaliation of a family unit over time, that that can demonstrate a kind of animus distinct just from purely personal retribution. And the judge cited a case, and I believe that the government did as well, regarding a case in El Salvador where this court had found that family land ownership out of El Salvador was not sufficient in Zatino v. Holder. But I think this case is distinguished from that case apart from that petitioner being in the United States at the time that his family members were killed. That appeared to be a one-time incident that he also testified in that case that it was purely motivated by money, where in this case the persecution goes against the petitioner's family spanning over 20 years. And after they had moved off the land, they continued to be persecuted. So we do believe that the nexus is there to be able to satisfy the particular social group. Do we know anything about the being run over, that is to say the grandmother? I mean, what precisely happened? The grandmother survives. It's described by the IJ as being run over by motorcycles and cars. Being run over doesn't sound as though that's what happened. I mean, if you get run over, you probably died. Can you help me understand a little bit more as to what actually happened? Yes, Judge, it's my understanding based on the record, just something that I did not see the initial merits, but based on the record that the grandmother was in town and she was hit by, I believe, as you stated, some motorcyclists stating that they would be coming after the family, every last one of them. And so they were killed. And the petitioner noted in his testimony at the time, his grandmother was the one who was in possession of the land title. When his grandfather passed away, this was his grandfather's and so she inherited title to the land, but she did survive. Yeah, and that happens in either 2002 or 2003. That's correct, Your Honor. One of the difficulties you've got, because this is now just a withholding case, in one sense, motivation is easier to find because all you need to find is a reason. On the other hand, likelihood of future harm is a higher standard. Yes, Your Honor. We've got the killing of the grandfather in 1997. We've got the quote running over with the grandmother in 2003. I'm not quite sure what happened with respect to the aunt. Can you help me with that? Yes, Your Honor. The aunt also was targeted by a criminal organization according and noting that the petitioner was in the United States at this time when this happened in 2017. They were asking about the whereabouts of his father as he was the manager of the land. He believes because his father was the manager that these people believe perhaps that he was the title owner of the land and she was severely beaten. It does seem that she subsequently passed away. That's not 100% clear. His testimony states that she developed a tumor or some cancer perhaps and passed away after that. That's why we don't have an affidavit from the aunt. I don't have anything further regarding details on that. Okay. Listen, you're down to just a little under two minutes. Let's hear from the government and then we'll give you a chance to respond. Thank you, Your Honor. May it please the court, Your Honor. Joanna Watson on behalf of the United States Attorney General. Here, the immigration did not commit an error in concluding that the particular social group proffered by petitioner was not recognizable under the act. We're looking here at the group that was presented and that's nuclear family members of landowners in Guatemala. As the immigration judge found, while nuclear family members may limit the people in the group, the other characteristic of landowners is not particular. I mean, it could essentially cover anyone that is a landowner, that is a family. Let me interrupt with my apologies and ask you the same question for the essay adversary. I understand, you know, I read Cordoba and I know that, you know, we have precedent here that large land ownership, you know, satisfies the underlying standard, but you have to be able to establish that the society perceives the large ownership as a distinct group. I just don't know as a practical matter, how you can ever establish that in this particular dynamic when we're dealing with something which is somewhat amorphous to me, like large land ownership, whatever. How do you ever establish how society perceives that to satisfy the necessary standard? That's the whole thing with social group. It's not an easy, it's not easy to show that your membership in a social group. Social groups may be fairly easy. Somebody is accused of being a communist or maybe El Chapo. We had that trial in the Eastern District not too long ago, but when it comes to land ownership, it seems to be so fuzzy. I don't know whether it's ever possible to really satisfy that standard, other than theoretically. I don't know, maybe if there are extremely well-known family owners in an area that owned the largest plot of land and they were well-known and employed. You have 135 acres here. I don't know how many other people in Guatemala own 135 acres. Isn't the size of it, the numerosity and the sort of uniqueness of the sufficient to satisfy that amorphous standard? We're looking at the group that's presented, which is nuclear family members of landowners. It's not characterized by wealth. We're looking at how it was presented. We're not morphing it to landowners and family members like was done in the 28-J, I believe Garcia. In that case, they assumed without deciding that landowners and family members, two separate groups, they assumed without deciding that they were cognizable groups. The whole basis of the remand was for the agency to decide in the first instance whether they were officially cognizable social groups. Here, the IJ made that determination and provided a reason basis for this determination. There's no evidence in the record of how this community perceived nuclear family. What evidence do you think would satisfy that standard? Give me an idea. I'm just curious. Maybe if they employed a lot of people in the area and everybody knew of them and they were the only large farm in the area. We have none of that background in this case. We're not even talking about the landowners here. We're talking about nuclear family members as parents and their children. How far does this go out? Is this it's aunts, uncles, cousins, second cousins? It's a really broad group that's not particular or nor socially extinct. Like I said, there's no evidence in the record of how they're viewed. There's evidence that petitioner put in of how he believes that the perpetrators viewed them, but not how society views. That's the important. I guess that's my problem. I don't understand what evidence you would have to induce to show what society perceives here. I guess that's my concern. It varies case by case. Here, it's just not there to show social distinction. In any event, going through, in order to succeed, he's got to show that this cognizable social group and show that a reason for the harm was his membership in the group. And he repeatedly states throughout the testimony and his credible fear interview, that this was a land dispute. It was distant relatives. They believe that family members killed one of their sons. And it's personal retribution. And criminals trying to I recognize that's a difficult hurdle for your adversary to overcome. We understand that. But the fact that there is some evidence that this is an intra-family dispute, doesn't mean that wanting the land and taking for the moment, the large landowner nuclear family as a particularized social group, for purposes of withholding, all we need is a reason. The fact there may be another reason doesn't matter. It doesn't even need to be a central reason. It just needs to be a reason. And I think there's enough evidence in the record actually to compel that they want the land. Quite aside from whether there's some other dispute about a family member. You may want on other grounds, but it seems to me that a reason that they want the land is that they want the land. That's pretty clearly established in the record. I mean, that's what they wanted. That's what they took. Correct. But you have to show the motive. Was the motive to get the land or was the motive? It's unfortunate what's happened to the family, but they wanted the land. And the immigration judge separated the people from the land and showed. And what was discussed earlier by petitioner's counsel about the grandmother being pursued again. And as the immigration said, it was because they wanted to own the land outright. The fact that they had taken over the land doesn't mean they had the deed to the land. And there's just not enough evidence here to show that they pursue family members of landowners. It was all for criminal. I mean, he's repeatedly say it's a land dispute and you know, they were jealous of us. If you're going after the family that owns the land because you want the land, what's the difference between that and going after the family because they are the family that owns the land? They wanted the land. The whole purpose was to get the land. It's unfortunate they weren't going after them because they were a member of a group, because they have an animus towards family members of landowners. No, they wanted access to the land or what petitioner had said, that was personal retribution because they believe that one of the family members had killed one of their family members. Does petitioner have US citizen children at this point? I believe he does, but I cannot say with certainty. And does he have a criminal record? The three US citizen children. Yeah. And how about a criminal record? Just the reinstated removal order. I'm wondering if he's a priority, a removal priority at this point and whether- Well, I think because of the reinstatement, the reinstated, you know, he's already been second time. So I believe that would make him a priority because of the reinstated removal order. He's already been removed once from the country. So would there be any point of trying to mediate this case? Unfortunately not. I know that's your initial response. I sat with the panel a month ago where we had several cases where there were family members who were children, who were US citizens, and there was no evidence of criminality or illegal activity other than the illegal entry. And the government was willing to mediate. I'm not sure what the answer is going to be after mediation, but the government was willing to mediate. I'm not sure I see how different this case is. The reinstated removal order. I don't believe there's anything with DHS that it wouldn't be a priority for somebody who's already been removed. I mean, he could have been federally prosecuted, sentenced to jail for reentering again after the removal order. And I just don't see how DHS would prosecutorial discretion or anything in this instance. It doesn't appear that he'd be eligible for any kind of relief, and it would just hold things off. Yeah. Well, the decision whether to mediate may be made at a slightly higher level than you. So I wonder if it's possible, whether it would be at all fruitful for us to make a formal inquiry, and then it would kind of go through your channels to decide. I can say with relative certainty that this would not be a case that mediation would benefit. We're looking into prosecutorial discretion, and they haven't come out with a new memo. But like I said, it's a reinstatement removal order, and you're actually limited to what you can even apply for. That's why he's not eligible for asylum and only withholding, which is not a per-one. I understand the posture in which this is coming up, of course. I mean, I can look into it. Yeah. But it's... I think the substance is. However, you're probably correct about the prior removal. I understand that. But the reality is that he's been here for a long time. He's raised a family. He has not been accused of any crime while he's been here. And I think that's what triggers our concern, I guess, from a humanitarian point of view. Right. I mean, if it wasn't for the reinstatement order, then maybe that would be some possibility. I mean, he's been removed once already, and that's a criminal offense right there, a federal offense that he could be charged with. So I don't see him in this instance. But I guess I have a little bit more time. I mean, I just say that this, I mean, it's a very broad nuclear family members of landowners in Guatemala. That's just not defined with particularity or social distinction. And that as immigration judge found, I mean, the evidence here as to Nexus, you know, it's substantial evidence. In other words, does the record compel a different conclusion? It's not substituting judgment. And here, it just, it simply doesn't compel the conclusion that, you know, that his membership in the group was the reason for the harm. I mean, it's personal vendetta and unfortunate financial gain. And if there's no questions on Kat, then I'll rest on the briefs. Okay, any further questions from the bench? No. Okay, thank you. Anlu, you've saved about two minutes. Thank you, your honors. I just want to touch on just a few brief points and specifically going to judge Block's concern about what evidence would satisfy the standard. I do think that, you know, if this case were remanded, that there could be evidence submitted to the record now that the petitioner is no longer detained and he has additional resources and quite frankly, a little more time, including an expert witness that was not, I don't think economically feasible for him at the time that could provide evidence to the immigration judge that would show how landowners would be distinct. As it's already been previously stated, I think the petitioner in this case owns a large amount of land that was the most productive in the region. As we've already stated, perhaps knowing how many landowners in that region, how many people were employed, how long in generations that this land had been owned, I mean, much like family were innately tied to that. I mean, this land goes generations by generations versus someone owning land, maybe a year versus 200 years could sway this court or even maybe the immigration judge with more information. Also regarding government agencies that have been created that show that the Guatemalan government distinguishes landowners also. I think there's a little bit of information that there has been maybe an agency to deal with some land disputes, but further information on that. We would also just ask this court to consider that it was not just purely retribution. He did testify that when he was being beaten with his siblings, this was done in conjunction with threats against their lives unless they abandoned their land. So we do believe that they've shown that motive. So we do believe that there is a particular social group, that there's particularity and social distinction and that there was a motive to that. We would just rest otherwise on the acquiescence and cat claims. And then finally, just as a note, perhaps for the loyal attorney as well, just for consideration regarding mediation, that the petitioner in this case did come into ICE custody, was just based on a targeted task force that they sent ICE officers to his house. And arrested him. And that's based on the I-213 that's provided as part of the record. It was just a targeted task force. So he was not brought to the attention of ICE of any other criminal conduct. Thank you for your time. Okay, thank you very much. Thank both sides for your helpful arguments. Lemus Hernandez versus Garland submitted for decision. And that's the end of our argument session for this morning. We're now in adjournment. Thank you very much. Court for this session now stands adjourned. Thank you.
judges: W. Fletcher, Friedland, Block